**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ANTHONY MOON,                                    *

Plaintiff,                                        *

v.                                                *          Civil Action No. ELH-20-2171

ROBERT GREEN, *et al.*,                           *

Defendants.                                       *
                                                 ***

**<u>MEMORANDUM OPINION</u>**

Anthony Moon, the self-represented plaintiff, has filed suit against multiple defendants, pursuant to 42 U.S.C. § 1983. The defendants include Corizon Health, Inc. ("Corizon"); Yonas Sisay, M.D.; Tianna Sherrod-Dixon; and Chidi Oriaku (collectively, the "Corizon Defendants"). In addition, Moon has sued Secretary Robert Green; Commissioner Wayne Hill; and former Warden J. Philip Morgan (collectively, the "State Defendants"). And, he has sued Wexford Health Sources, Inc. ("Wexford") and Ashok Krishnaswamy, M.D. [1] Moon alleges that defendants acted with deliberate indifference to his serious medical needs by failing to provide him with adequate medical care after his shoulder surgery. He also claims the State Defendants denied him due process in responding to his Administrative Remedy Procedure ("ARP") requests. ECF 1.

Wexford has moved to dismiss the Complaint (ECF 16), supported by a memorandum. ECF 16-1 (collectively, the "Wexford Motion"). The Corizon Defendants have moved to dismiss or, in the alternative, for summary judgment. ECF 25. The motion is supported by memorandum (ECF 25-1) (collectively, the "Corizon Motion") and exhibits, including plaintiff's medical records

---

[1] The Clerk shall amend the docket to reflect the full and correct names of the various defendants. Dr. Krishnaswamy was never served with the Complaint. Therefore, I shall dismiss the case as to him, without prejudice.

(ECF 25-4) and the declarations of Dr. Sisay (ECF 25-3), Oriaku (ECF 25-5), and Sherrod-Dixon (ECF 26-6).  The State Defendants have also moved to dismiss or for summary judgment (ECF 33), supported by a memorandum (ECF 33-1) (collectively, "State Motion") and the Declaration of J. Philip Morgan (ECF 33-2).  Moon was notified of his right to respond to the motions (ECF 17; ECF 26; ECF 34).  But, he has not done so.

The motions are ripe for review, and no hearing is needed.  *See* Local Rule 105.6.  For the reasons discussed below, I will grant the motions.

## I.      Background

At all times relevant to the Complaint, Moon was confined at Maryland Correctional Institution-Jessup ("MCIJ").  ECF 1 at 2.  He filed this suit on July 24, 2020, arising from surgery performed by Dr. Ashok Krishnaswamy on July 5, 2019, to repair plaintiff's left rotator cuff.  Plaintiff claims that he was not provided with adequate follow-up medical care.  ECF 1 at 4.  In particular, Moon alleges that defendants failed to follow the discharge instructions provided to him after the surgery, failed to provide him with appropriate pain medication, and failed to provide prescribed physical therapy.  ECF 1 at 4, 6.  Further, Moon claims that he never spoke to "Nurse Tianna" and was not told by her that he was scheduled to see Dr. Krishnaswamy.  ECF 1 at 5.  He also claims that he was falsely told that Dr. Krishnaswamy was out of the country on the date for his follow up exam.  *Id.*

Further, Moon alleges that the communication and professionalism of medical staff at MCIJ is so malicious and disrespectful that it results in the failure to treat inmates and causes other inmates to avoid being seen my medical staff, to the detriment of their health, even resulting in their death.  ECF 1 at 6.  Moon states that private medical contractors such as Wexford and Corizon are known as "inmate killers."  *Id.*  He explains that these companies hire the lowest grade medical

providers and, if the health care providers furnish too much treatment to inmates, they are moved to other prisons or fired. *Id.* Additionally, Moon alleges that he was denied due process regarding the filing of his ARP, and that information contained in the response to his complaints regarding the denial of medical care was fabricated. ECF 1 at 4-5. He seeks compensatory and punitive damages as well as declaratory and injunctive relief. ECF 1 at 12-14.

Dr. Sisay, a medical doctor employed by Corizon at MCIJ since January 1, 2019, submitted a Declaration. ECF 25-3; *see id.* ¶ 2. He avers that he provided medical care to Moon at the relevant time. *Id.* In addition, Dr. Sisay reviewed Moon's medical records. *Id.* ¶ 3. They are docketed at ECF 25-4, and exceed 400 pages. Dr. Sisay opines that, within a reasonable degree of medical certainty, the care and treatment Moon received was appropriate and in accordance with the applicable standard of care. ECF 25-3, ¶ 25.

As a physician, Dr. Sisay generates requests for specialty care but does not approve the requests or schedule off-site appointments, including orthopedic evaluations. *Id.* ¶ 5. Offsite appointments are scheduled by medical department administrative staff, and Dr. Sisay is not responsible for supervising them. *Id.*

On January 10, 2019, Dr. Sisay saw Moon for a chronic care visit. ECF 25-3, ¶ 6; ECF 25-4 at 308-10. Moon complained of left shoulder pain that had existed for one year. Dr. Sisay noted that Moon had already undergone physical therapy and had received a steroid injection and had been seen by an in-house orthopedist on November 27, 2018, who recommended a referral to an outside orthopedist for possible arthroscopy and rotator cuff repair. *Id.* Dr. Sisay renewed Moon's Tolmetin, a nonsteroidal anti-inflammatory drug ("NSAID"), and submitted a request for an off-site orthopedic evaluation. ECF 25-4 at 311-12; 409.

Dr. Sisay next evaluated Moon on April 9, 2019.  ECF 25-3, ¶ 7; ECF 25-4 at 318-20.  Dr. Sisay noted that in order to evaluate the request for an outside orthopedic consultation, Corizon's Utilization Manager ("UM") requested information regarding the degree of impairment to Moon's activities of daily living ("ADLs").  ECF 25-3, ¶ 7.  Moon reported pain in the left shoulder and limitation in the motion of his shoulder that affected his showering, dressing, and hair grooming. *Id*.  He reported eating with his right hand and indicated that while he worked in the print shop, he could not carry boxes.  *Id*.  Dr. Sisay updated Moon's medical records and increased Moon's pain medication.  *Id*.

On May 8, 2019, Moon was evaluated by a private physician, Dr. Krishnaswamy, an orthopedist.  This occurred at Bon Secours Hospital ("BSH") (now Grace Medical Center).  ECF 25-3, ¶ 8; ECF 25-4 at 149-50.  Moon reported pain and weakness in his left shoulder after playing basketball over a year earlier. ECF 25-3, ¶ 8. After examination, Dr. Krishnaswamy found that Moon would benefit from a mini-open acromioplasty with rotator cuff repair, which could be performed as an outpatient procedure.  *Id*.  Dr. Krishnaswamy explained the procedure and potential complications to Moon and advised that the surgery would be performed as soon as the proper authorization was obtained.  *Id*.

Dr. Sisay again evaluated Moon on June 18, 2019.  ECF 25-3, ¶ 9; ECF 25-4 at 323-25. He noted that Moon had left shoulder pain with limited range of motion and that the offsite orthopedist recommended surgery.  ECF 25-3, ¶ 9.  The request for the surgery had been submitted and was awaiting approval from the Regional Medical Director ("RMD").  *Id*.  Moon reported difficulty changing clothes, showering, and working.  *Id*.  Dr. Sisay forwarded this information to the RMD to assist in evaluating the need for surgery.

Notably, the surgical request was approved. *Id.* On July 9, 2019, Dr. Krishnaswamy performed surgery on Moon's left shoulder at BSH. ECF 25-3, ¶ 10; ECF 25-4 at 100-106. Dr. Krishnaswamy diagnosed Moon as suffering from impingement syndrome with a full-thickness irregular tear of the left shoulder.  ECF 25-3, ¶ 10. He performed a mini-open acromioplasty of the left shoulder with repair of the rotator cuff tear using Stryker anchor suture and sling application. *Id*.  Moon was described as tolerating the procedure well.  *Id*.  Moon's discharge instructions included hydrocodone/acetaminophen (Norco) 5/325 mg every 6 hours, as needed for pain relief, Keflex (an antibiotic) for 7 days, and follow up with Dr. Krishnaswamy in two weeks.  ECF 25-3, ¶ 10; ECF 25-4 at 112-13.

Dr. Sisay explains that Norco, which is used to treat moderate to severe pain, is a combination opioid pain reliever (hydrocodone-a schedule II narcotic), and a non-opioid pain reliever (acetaminophen), which requires the approval by the RMD and delivery from an outside pharmacy.  ECF 25-3, ¶ 11. "In the prison setting, Tylenol #3 is used to treat moderate to severe pain, including pain following surgery."  *Id*.  Tylenol with Codeine (Tylenol #3) is a schedule III narcotic pain reliever and routinely kept in stock in the prison system and readily available. *Id*.

From July 9, 2019 to July 10, 2019, Moon was prescribed ibuprofen (an NSAID) and one tablet of Tylenol #3 every 6 hours, as needed for pain relief.  ECF 25-3, ¶ 11; ECF 25-4 at 338. On July 10, 2019, Moon's Tylenol #3 dose was increased to two tablets three times per day, as needed, until July 14, 2019.  ECF 25-3, ¶ 11.  Dr. Sisay explains that "CDC guidelines provide that narcotic or opioid medications should not be prescribed long term for chronic pain due to risk of dependence."  *Id*.  Rather, narcotics should be prescribed the first few days after surgery or for an acute injury.  *Id*.  Dr. Sisay avers that Moon was prescribed narcotic analgesics until July 14, 2019, which is in accordance with the standard of care. *Id*.

Nurse Practitioner Yetunde Rotimi evaluated Moon on July 10, 2019.  ECF 25-3, ¶ 12; ECF 25-4 at 337-39.  Moon reported that the surgery went well but he was experiencing pain in the shoulder and was not able to sleep.  ECF 25-3, ¶ 12. Rotimi noted the dressing was clean, no swelling or warmth was observed at the surgical site, and Moon was able to move his fingers.  However, Moon appeared in pain with a frowning face and clenching his teeth.  She increased his dosage of Tylenol #3 to two tablets, as needed, three times a day and continued Moon's prescriptions of ibuprofen and Neurontin for pain management.  *Id*.  Rotimi also reviewed Moon's discharge instructions and noted Moon was taking antibiotics.  *Id*.  She submitted a consultation request for Moon to be seen by Dr. Krishnaswamy for his two-week follow up appointment; the request was approved that day.  ECF 25-4 at 340-41, 416.

Administrative Assistant Tianna Sherrod-Dixon, a Corizon employee who works at MCIJ, confirmed that on July 10, 2019, Rotimi submitted a consultation request for Moon to return to Dr. Krishnaswamy for his two-week post surgical follow up.  ECF 25-6 (Decl. of Sherrod-Dixon), ¶¶ 2,6; ECF 25-4 at 340-41.  Sherrod-Dixon explains that consultation requests are submitted into the CARES system, where they are reviewed by Corizon UM for approval.  ECF 25-6, ¶ 6.  She avers that the follow-up request was approved on the same day it was requested.  *Id*.

Dr. Sisay saw Moon on July 17, 2019.  ECF 25-3, ¶ 13; ECF 25-4 at 342-44.  He noted that Moon had undergone surgery on July 9, 2019, and was awaiting his follow up with the surgeon.  ECF 25-3, ¶ 13.  Moon reported feeling well, and no swelling or acute tenderness at the surgical site was noted.  *Id*.  That day, Dr. Sisay contacted Sherrod-Dixon regarding the scheduling of Moon's follow up appointment because the regular scheduler was on vacation.  ECF 25-3, ¶ 13; ECF 25-6, ¶ 7; ECF 25-4 at 342-44.  *Id*.  Sherrod-Dixon contacted Ms. Patrice, "the DOC[2]

---

[2] Presumably, "DOC" is an abbreviation for the Maryland Division of Correction.

Scheduler" at BSH, and was advised that Dr. Krishnaswamy was going out of the country and that the next available appointment was not until August 21, 2019.  ECF 25-6, ¶ 7; *see also* ECF 25-3, ¶ 14; ECF 25-4 at 47.  Sherrod-Dixon scheduled Moon's follow up for that date.  ECF 25-6, ¶ 7.

The State Contract Monitor contacted Sherrod-Dixon on July 24, 2019, inquiring about Moon's follow-up appointment.  ECF 25-6, ¶ 8.  Sherrod-Dixon explained that she had contacted the DOC scheduler and was told the doctor would not be available until August 21, 2019.  In response to the State Contract Monitor advising Sherrod-Dixon to document her efforts, she entered a note into the medical records that day regarding her efforts to schedule Moon's medical appointment.  ECF 25-6,  ¶ 8; ECF 25-4 at 47.

Further, Sherrod-Dixon explains that during that week Moon reported to the medical department on a number of occasions asking personnel about the status of his follow up appointment.  ECF 25-6, ¶ 9.  On July 24, 2019, Sherrod-Dixon was contacted in order to inform Moon that the orthopedic surgeon had an emergency and that Moon would be scheduled for the next available appointment.  *Id*.

Oriaku is a Registered Nurse ("RN") employed by Corizon as the Health Services Administrator ("HAS") at MCIJ.  ECF 25-5 (Decl. of Oriaku), ¶ 2.  As the HAS, Oriaku avers that her role is administrative and she does not actively practice nursing or schedule appointments for patients.  *Id*. ¶ 5.  A scheduler is responsible for scheduling inmates' medical appointments, and Oriaku was not involved in scheduling Moon's post-surgical follow up visit with Dr. Krishnaswamy.  *Id*. Oriaku avers, however, that she is aware that Moon's two-week post-surgical follow up with Dr. Krishnaswamy was delayed because the doctor was out of the country.  *Id*. ¶ 6.

Notably, Dr. Krishnaswamy examined Moon on August 21, 2019. ECF 25-3, ¶ 15; ECF 25-4 at 91-94.  The remaining sutures were removed and Dr. Krishnaswamy noted that the wound

had healed well.  ECF 25-3, ¶ 15.  He referred Moon for physical therapy, recommending 2-3 visits per week for 6-8 weeks.  ECF 25-3, ¶ 15; ECF 25-4 at 95.  Dr. Sisay opines that, within a reasonable degree of medical certainty, Moon did not experience any harm due to his delay in returning to Dr. Krishnaswamy for follow up.  ECF 25-3, ¶ 15.

The following day, Dr. Sisay submitted a consultation request for physical therapy, noting that the orthopedist had recommended six weeks of therapy.  ECF 25-3, ¶ 16; ECF 25-4 at 345-56, 418-19.  Moon was approved for 7 visits and attended physical therapy from September 11, 2019 to October 3, 2019.  ECF 25-3, ¶ 16; ECF 25-4 at 347-54. On the final visit, the physical therapist noted that Moon completed the exercises with no significant increase in pain or symptoms.  ECF 25-3, ¶ 16; ECF 25-4 at 354.

Dr. Sisay next saw Moon on October 21, 2019, for a chronic care visit.  ECF 25-3, ¶ 17; ECF 25-4 at 356-58.  At that time, Dr. Sisay noted that Moon had completed five weeks of physical therapy but complained of limited range of motion in the right shoulder, the non-operative joint. ECF 25-3, ¶ 17.  The right shoulder had no swelling or tenderness and the surgical site on the left shoulder was healed. *Id*.  Moon's other extremities were normal.  *Id*.  Dr. Sisay prescribed Mobic 7.5 mg for pain and continued Moon's prescription for Neurontin.  *Id*.  Dr. Sisay submitted consultation requests for an eight-week follow up with Dr. Krishnaswamy and an extension of physical therapy.  ECF 25-3, ¶ 17; ECF 25-4 at 359-62, 420-26.

On October 22, 2002, the Corizon UM "advised" an Alternative Treatment Plan ("ATP") as to the physical therapy request.  ECF 25-3, ¶ 17.  The UM noted that the physical therapist indicated Moon was able to complete all of his exercises, Moon had been educated and directed on exercises, and therefore it was recommended that Moon consider continuing therapy in the form of a Home Exercise Program ("HEP"), where Moon could perform on his own the exercises

demonstrated by the physical therapist. *Id*.; ECF 25-4 at 401, 403-04. On October 24, 2019, the Corizon UM "advised" an ATP, recommending an orthopedic follow up by the onsite provider and reserving an orthopedic follow up with Dr. Krishnaswamy for "special concerns." ECF 25-3, ¶ 17; ECF 25-4 at 402.

At sick call on December 3, 2019, Moon was evaluated by PA Matthew Carpenter, due to continued complaints of left shoulder pain after surgery and physical therapy. ECF 25-3, ¶ 18; ECF 25-4 at 367-68. During the evaluation, Moon reported that he was able to work and was independent with activities of daily living. *Id*. Carpenter noted that Moon had consultations for physical therapy and an orthopedics follow up. *Id*. Carpenter increased Moon's Mobic prescription from 7.5 mg to 15 mg. ECF 25-3, ¶ 18; ECF 25-4 at 370.

Moon was evaluated by NP Chantal Tchoumba on January 3, 2020, during a provider sick call. ECF 25-3, ¶ 19; ECF 25-4 at 369-70. At that time, Moon reported mild but unresolved improvement in the left shoulder pain and requested additional physical therapy. ECF 25-3, ¶ 19. Moon was advised that a consultation request was generated on October 21, 2019, and it was awaiting approval. *Id*. Tchoumba educated Moon about routine stretching exercises as tolerated to prevent stiffness and Moon indicated his understanding. Tchoumba also renewed Moon's Mobic prescription through April 3, 2020. *Id*.

Dr. Sisay examined Moon on January 29, 2020. ECF 25-3, ¶ 20; ECF 25-4 at 371-73. Dr. Sisay noted that Moon's range of motion and pain had both improved. No skeletal tenderness or joint deformity was observed and his extremities appeared normal. *Id*. Dr. Sisay prescribed ibuprofen 800 mg for pain from January 22, 2020 to January 29, 2020, and renewed Moon's prescription or Mobic 15 mg until May 29, 2020. ECF 25-3, ¶ 20. According to Dr. Sisay, an

entry on the same date in the medical records stating "orthopedic follow up" was entered in error. *Id.*

On April 20, 2020, Dr. Sisay updated Moon's chart, noting that the facility's medical services were working on COVID-19 emergency protocols.  ECF 25-3, ¶ 21; ECF 25-4 at 374-75. Dr. Sisay requested nursing to provide Moon a printout of the American Association of Orthopedic Surgeon's shoulder exercise program so that he could complete exercises in his cell.  ECF 25-3, ¶ 21.  Dr. Sisay states that he understood Moon refused to accept the printout.  *Id.*  Moon's prescription for Mobic 15 mg was renewed through August 20, 2020. *Id*.

Dr. Sisay evaluated Moon on July 14, 2020, and Moon's range of motion and shoulder pain were both improved and Moon reported that he was working.  ECF 25-3, ¶ 22; ECF 25-4 at 378-80.  Dr. Sisay renewed Moon's prescription for Mobic 15 mg until November 14, 2020.  *Id*.

On September 21, 2020, Dr. Sisay examined Moon after he had passed out.  ECF 25-3, ¶ 23; ECF 25-4 at 382-84.  Moon was administered Narcan and regained consciousness when he reached the medical unit..  ECF 25-3, ¶ 23.  Moon denied using drugs or taking any medication. *Id*.  Moon had no focal neurological deficits.  *Id*.  Dr. Sisay ordered an EKG, which was normal, blood work, and monitoring in the clinic for two hours.  *Id*.

Dr. Sisay again evaluated Moon on October 5, 2020.  ECF 25-3, ¶ 24; ECF-4 at 387, 402, 404.  Moon reported that he felt "perfectly fine."  ECF 25-3, ¶ 24; ECF-25-4 at 402.  Dr. Sisay renewed Moon's prescription for Mobic 15 mg until February 5, 2021.  ECF-4 at 404.

J. Philip Morgan is the Assistant Commissioner for the Maryland Division of Correction and was previously the Warden of MCIJ.  ECF 33-2, ¶ 1.  He avers that medical services are provided to MCIJ inmates by private medical contractors and he has no personal involvement in the provision of medical care.  *Id*.  Further, he had no authority to make decisions regarding an

inmate's care or to order medical staff to perform a particular medical procedure or render a particular treatment. *Id.* As Warden, he had no responsibility under the medical company contract to monitor the provision of medical services to inmates. Morgan is not licensed to practice medicine and generally defers to medical staff regarding medical care of inmates. *Id.*

When responding to an inmate's complaint regarding medical care, Morgan avers that he and his staff rely on the reports, assessment, and judgment of the trained medical staff to prepare a response to the complaint for his signature. *Id.* ¶ 4. Morgan specifically denies interfering with, hindering, or delaying medical treatment and care for Moon. *Id.* ¶ 5.

## II.     Standards of Review

Defendants move to dismiss or, in the alternative, for summary judgment. I will consider the claims against Wexford, Corizon, Oriaku, and the State Defendants in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). I will consider the claims against Dr. Sisay and Sherrod-Dixon under Fed. R. Civ. P. 56.

Because Moon is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *accord Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

11

### A.

The motions of the Corizon Defendants and the State Defendants are styled as motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  *See* ECF 25; ECF 33.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways, Inc.,* 510 F.3d 442, 450 (4th Cir. 2007).  Under Rule 12(b)(6), however, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland,* 672 F. App'x 220, 222 (4th Cir. Nov. 29, 2016) (per curiam).

A court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so.  *See Laughlin v. Metro Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.,* 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give

notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).  However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin,* 149 F.3d at 261.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id*. at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id*. at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc*., 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015).  However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co*., 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule

56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC,* 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Fin., Inc.*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.  And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant."  *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

14

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Plaintiff has not filed an affidavit under Rule 56(d). Moreover, as to the claims against Dr. Sisay and Sherrod-Dixon, I am satisfied that it is appropriate to address their motion as one for summary judgment because this will facilitate resolution of this case. But, as to the remaining defendants, I shall construe the motions under Rule 12(b)(6).

## B.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006); *see In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.,* 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young,* 569 U.S. 221 (2013); *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a

plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  The rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions'...."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.,* 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if...[the] actual proof of those facts is improbable and...recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), cert. denied, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting

*Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies...if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'"  *Goodma*n, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis in *Goodman*) (citation omitted).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co*., 637 F.3d at 448).  Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein...."  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger.,* 510 F.3d at 450.

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment.  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).  In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."  *Goines*, 822 F.3d at 166 (internal citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel.*

*Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)); *see USA Eng. Language Ctr. v. Accrediting Council for Continuing Educ. & Training, Inc.*, __ F. App'x __, 2021 WL 3162671, at *2 (4th Cir. July 27, 2021). And, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. In other words, the "general rule" is that "the exhibit prevails in the event of a conflict between an attached exhibit and the allegations of a complaint." *Id.* at 165. But, "in cases where the plaintiff attaches or incorporates documents for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of the document as true." *Id.* at 167.

### C.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). But, summary judgment is appropriate if the evidence is "so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Roland v. United States Citizenship & Immigration Servs*., 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Wilson v. Prince George's County*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts,* 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French,* 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (citation omitted). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *accord Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

In sum, to defeat summary judgment, conflicting evidence, if any, must give rise to a genuine dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Judd*, 718 F.3d at 313. On the other hand, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III.    Discussion

### A.  Medical Claims

### 1.

Plaintiff's claims regarding the denial of adequate medical care are governed by the Eighth Amendment to the United States Constitution, which prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).  In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failure to protect inmates from attack, inhumane conditions of confinement, and failure to render medical assistance.  *See Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 303; *Hixson v. Moran*, 1 F. 4th 297, 302 (4th Cir. 2021); *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017).  "It is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'"  *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (citation omitted).

The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98

(quoting *Farmer*, 511 U.S. at 834, 837-38); *see Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017).

Of relevance here, in order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Lightsey*, 775 F.3d at 178; *Iko v. Shreve*, 535 F. 3d 225, 241 (4th Cir. 2008).  The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

An Eighth Amendment claim for deliberate indifference to serious medical needs "includes objective and subjective elements."  *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available.  *See Farmer*, 511 U.S. at 837; *see also Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Hixson*, 1 F. 4th at 302; *Schilling*, 937 F.3d at 357; *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King v. Rubenstein*, 825 F.3d 206, 219 (4th Cir. 2016).

A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Mays*, 992 F.3d at 300.  Proof of an objectively serious medical condition, however, does not end the inquiry.  As the Court explained in *Heyer*, 849 F.3d at 209-10: "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry."

23

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial *risk* of serious harm.'" *Heyer*, 849 F.3d at 210 (quoting *Farmer*, 511 U.S. at 837) (emphasis added in *Heyer*); *see Thompson*, 878 F.3d at 97-98. But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

In the context of a claim concerning medical care, the subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837. The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see Young*, 238 F.3d at 575-76 ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care."); *see Mays*, 992 F.3d at 300.

As the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" (citation omitted). Put another way, "it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the

24

official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*).

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  But, "[t]he necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*).

"Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.  Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Formica*, 739 F. App'x at 754; *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.").  Moreover, mere negligence or malpractice does not rise to the level

of a constitutional violation. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle*, *supra*, 429 U.S. at 106). Rather, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). In other words, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice*, 58 F.3d at 105.

But, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012).

In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive,

well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842 114 S.Ct. 1970). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Even if the requisite subjective knowledge is established, however, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. And, reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

## 2.

The evidence, viewed in the light most favorable to plaintiff, establishes that plaintiff has not stated a claim against Corizon, Wexford, Oriaku, or the State Defendants for the denial of adequate medical care.

Moon brings this action against Wexford and Corizon, the corporate entities, in their roles as the medical providers at MCIJ and the employer of the individual defendant medical providers. Similarly, he has sued the State Defendants and Oriaku in their roles as supervisors within MCIJ, the Division of Correction, and the medical department.

Wexford was not the medical contractor at the time of the conduct complained of. Therefore, it cannot be held liable under any theory.

In any event, a corporate entity is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See*

*Austin v. Paramount Parks, Inc*., 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co*., 678 F.2d 504, 506 (4th Cir. 1982).[3]  Moreover, Moon's allegations against Wexford, Corizon, Oriaku, and the State Defendants do not suggest a basis for individual supervisory liability.  In *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994), the Fourth Circuit articulated that supervisory liability requires that a defendant: (1) had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive risk of a constitutional injury; (2) the response to that knowledge was so inadequate as to show deliberate inference to or tacit authorization of the allege offensive practices; and (3) there was an affirmative causal link between defendant's inaction and the alleged constitutional injury.

As to Corizon, Moon's claim fails to the extent that he relies on *Monell v. Dep't of Social Servs. of N.Y.,* 436 U.S. 658 (1978), to establish municipal liability for constitutional violations proximately caused by a policy, custom, or practice.  Municipal policy arises from written ordinances, regulations, and statements of policy, *id.* at 690); decisions by municipal policymakers, *Pembaur v. Cincinnati*, 475 U.S. 469, 482-83 (1986); and omissions by policymakers that show a "deliberate indifference" to the rights of citizens.  *See Canton v. Harris*, 489 U.S. 378, 388 (1989).  Whether the procedures in place for approving and scheduling outside consultations constitute a "policy" for purposes of *Monell* liability need not be determined where, as here, there has been no resulting constitutional violation.

To the extent Moon seeks to hold the State Defendants liable, Moon fails to state a claim.  Without subjective knowledge, a prison official is not liable.  Denial of plaintiff's ARP requests does not alone establish liability.  *Whittington v.Ortiz,* 307 Fed, Appx. 179, 193 (10th Cir. 2009)

---

[3]  Respondeat superior is a legal doctrine that provides an employer is liable in certain instances for the wrongful acts of an employee.  *See Black's Law Dictionary* (8th ed. 2004).

("denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations."); *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped" grievances was not enough to establish personal participation).

Accordingly, I shall dismiss Moon's claims against Wexford, Corizon, Oriaku, and the State Defendants.

**3.**

The medical records provide no support for Moon's claim that he was denied adequate medical care after the surgical repair of his left shoulder rotator cuff.  Therefore, defendants Sisay and Sherrod-Dixon are entitled to summary judgment.

Moon contends that the medical providers failed to send him for his two-week post-surgical follow up with Dr. Krishnaswamy and that they lied when they claimed that Dr. Krishnaswamy was out of the country.  ECF 1 at 4.  There is simply no support in the record for Moon's allegation. To the contrary, the request for follow up by Dr. Krishnaswamy two weeks after Moon's surgery was immediately approved by the UM.  The difficulty in scheduling the follow-up appointment was not occasioned by the conduct of any of the named defendants but instead occurred because Dr. Krishnaswamy was unavailable to see Moon.

Moon was provided the first available appointment to see Dr. Krishnaswamy.  When he was ultimately evaluated by Dr. Krishnaswamy, his wound had healed well and there was no indication that any harm occurred to Moon due to the delay in the follow up appointment.  Nor is there any evidence to support Moon's bald contention that the medical providers falsely claimed Dr. Krishnaswamy was out of the country.

To the extent Moon claims that his discharge instructions were not followed, the defendants are entitled to summary judgment.  The record reflects that Moon was not provided the particular

analgesic medication prescribed by Dr. Krishnaswamy because that medication, a Schedule II narcotic, was not appropriate for the prison setting.  Instead, an alternative analgesic  was provided to Moon.  When Moon complained that he continued to have pain, his dosage was increased.  After expiration of the initial narcotic pain reliever prescription, Moon continued to receive analgesic medication, including ibuprofen, Mobic, and Neurontin, and his prescriptions were adjusted based on his reported complaints of continuing pain.

Moon's allegation that he was not provided proper physical therapy is also unavailing. Moon was approved for 7 sessions of physical therapy and completed 5 weeks of physical  therapy. At the end of his physical therapy, the therapist stated that Moon completed the exercises with no significant increase in pain or symptoms.  When Dr. Sisay requested additional sessions, the UM explained that Moon could continue therapy on his own, completing the exercises demonstrated by the therapist.  Later, when staff attempted to provide Moon with a printout of shoulder exercises to be performed on his own, he refused to accept them.

In evaluating Moon's medical records and numerous visits with medical staff, there is no evidence that defendants' conduct was reckless or so inadequate as to support a claim of deliberate indifference.  To the contrary, the defendants closely monitored Moon's post-surgical recovery. They submitted consultation requests for follow-up with the outside orthopedic surgeon as well as for physical therapy.  Although the post-surgery follow-up was delayed due to the unavailability of the surgeon, Moon suffered no harm.  His wound healed well, and he was provided analgesic pain medication.  The later request for follow-up with the orthopedist was declined by UM in favor of Moon being seen by the in house orthopedist, with the offsite orthopedist being reserved for special concerns.  Additionally, Moon was provided physical therapy and the later request for additional physical therapy was declined by UM in favor of home exercises.

Disagreements between medical staff and an inmate as to the necessity for, or the manner or extent of, medical treatment do not amount to a constitutional injury.  *See Estelle,* 429 U.S. 105–06 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.).   Moon's mere disagreement with the course of treatment provided by medical providers will not support a valid constitutional claim.  *See Russell,* 528 F.2d at 319.  In the absence of any genuine issue of material fact as to the evidence presented, summary judgment will be granted in favor of the individual Corizon Defendants.

**4.**

To the extent Moon intended to raise a medical malpractice claim based on this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a), the Corizon Defendants contend that the malpractice claim is subject to dismissal because Moon failed to comply with Maryland's Health Care Malpractice Claims Act ("HCMCA" or "Act"), Maryland Code (2013 Repl. Vol., 2019 Supp.), Courts & Judicial Proceedings Article ("C.J."), § 3–2A–01 *et seq.*  The Act establishes procedures for all "claims, suits, and actions ... by a person against a health care provider for medical injury allegedly suffered by the person in which damages ... are sought." C.J. § 3–2A–02(a)(1). The HCMCA is intended "to weed out" non-meritorious medical malpractice claims and reduce the costs of litigation.  *Wilcox v. Orellano*, 443 Md. 177, 184, 115 A.3d 621, 625 (2015); *see Walzer v. Osborne*, 395 Md. 563, 582, 911 A.2d 427 (2006); *see also Barber v. Catholic Health Initiatives, Inc.*, 180 Md. App. 409, 951 A.2d 857 (2008).

The HCMCA provides the process that a claimant must follow as a prerequisite to filing a suit in court seeking damages.  *See* C.J. §§ 3-2A-04(b)(1), (3).  Before filing suit, the claimant must first file a claim with the Health Care Alternative Dispute Resolution Office ("HCADRO"), an administrative body established by the Act.  *See* C.J. § 3–2A–04(a)(1)(i); *see also Alvarez v.*

*Md. Dept. Of Corr.*, PX-17-141, 2018 WL 1211533, at *8 (D. Md. Mar. 8, 2018) (stating that a medical malpractice claim must first be submitted to the HCADRO as a condition precedent to filing a medical malpractice suit).

Within 90 days of filing that claim, the claimant must submit a certificate of a qualified expert, along with a report of the attesting expert, setting forth the health care provider's alleged departure from the standard of care and proximate cause.  If a claimant fails timely to file an expert certificate and report, the suit is subject to dismissal, without prejudice.  C.J. § 3–2A–04(b)(1)(i); *see Wilcox*, 443 Md. at 185, 115 A.3d at 625; *Walzer*, 395 Md. at 578–79, 911 A.2d 427.

Moon neither asserts nor provides any documentation to show his compliance with the HCMCA.  Accordingly, to the extent he raises a medical malpractice claim under Maryland law, it will be dismissed, without prejudice.

## B.  The ARP

The Fourteenth Amendment's Due Process Clause guarantees that no state shall "deprive any person of . . . liberty . . . without due process of law."  To bring a due process claim, a plaintiff must first show the existence of a protected property or liberty interest.  *Mathews v Eldridge*, 424 U.S. 319, 332 (1976); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  To the extent Moon claims his ARP was improperly processed and dismissed, "inmates have no constitutional entitlement or due process interest in access to a grievance procedure."  *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017) (discussing *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994) ); *see Robinson v. Wexford*, No. ELH-17-1467, 2017 WL 4838785, at *3 (D. Md. Oct. 26, 2017) ("[E]ven assuming, arguendo, that defendants . . . did not satisfactorily investigate or respond to plaintiff's administrative grievances, no underlying constitutional claim has been stated" because "'inmates

have no constitutional entitlement or due process interest in access to a grievance procedure.'") (quoting *Booker*).

If Moon's intention is to assert that defendants violated State policies, procedures, rules, regulations, or State law, the mere violation of State law or regulation does not provide a basis for a due process violation. *See, e.g. Baker v. McCollan*, 443 U.S. 137, 146 (1979); *Riccio v. Cnty. of Fairfax, Va.,* 907 F.2d 1459, 1469 (4th Cir. 1990) ("If the state law grants more procedural rights than the Constitution would otherwise require, a State's failure to abide that law is not a federal due process issue").  Accordingly, any due process claim Moon seeks to raise in connection with the processing of his ARP is without merit.

### III.    Conclusion

For the foregoing reasons, I will grant defendants' motions.  In particular, I shall dismiss the claims against Wexford, Corizon, Oriaku, and the State Defendants.  And, I shall grant summary judgment in favor of Dr. Sisay and Sherrod-Dixon in regard to the deliberate indifference claims against them.  To the extent Moon seeks to raise a claim for medical malpractice, his claim will be dismissed, without prejudice.

A separate Order follows.

_____August 30, 2021_____          _____/s/_____
Date                                                   Ellen L. Hollander
                                                         United States District Judge